**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| R.M. A MINOR, BY AND THROUGH HIS | § | |
| PARENTS AND NEXT FRIENDS, | § | |
| ANTHONY ALAN MORRIS AND | § | |
| STEFANIE RAE WARNEKE, AND | § | |
| ANTHONY ALAN MORRIS, | § | Case No. 6:24-cv-00641-ADA-DTG |
| INDIVIDUALLY AND STEFANIE | § | |
| RAE WARNEKE, INDIVIDUALLY | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| THE UNITED STATES OF AMERICA, | § | |
| HEART OF TEXAS COMMUNITY HEALTH | § | |
| CENTER, INC. D/B/A | § | |
| WACO FAMILY MEDICINE | § | |
| RESIDENCY CENTER PROGRAM | § | |
| D/B/A WACO FAMILY MEDICINE | § | |
| CENTER AND JENNY LEE | § | |
| BROKOVEC, M.D., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT UNITED STATES OF AMERICA'S**
**REPLY IN SUPPORT OF MOTION TO DISMISS**

Defendant United States of America files this Reply in support of its Motion to Dismiss.

ECF No. 27.

**INTRODUCTION**

This case involves medical services provided to a Baylor Scott & White patient by a

Baylor Scott & White-employed physician at a Baylor Scott & White hospital—Baylor Scott &

White Hillcrest Medical Center (BSW Hospital). The basic problem with Plaintiffs' invocation

of jurisdiction under the FTCA remains today what it was when this case was filed: Ms.

Warneke was not a patient of WFM when she arrived at BSW Hospital on December 17, 2021,

and she did not become at WFM patient, for FSHCAA purposes, that night. The services provided do not fit squarely into any pre-approved exception for treatment of non-patients. And, though it had previously submitted particularized determinations for situations that did not squarely fit the statute and related regulations, WFM could have but did not apply for and receive a particularized determination of coverage for the services in this case.

The circumstances of this case therefore fall outside the FSHCAA's limited protections. Not only is that result consistent with the FSHCAA's textual limits, but it reflects common sense: the FSHCAA was not designed to benefit private hospitals by allowing them to shift medical malpractice liability to the federal government via community health centers working on their behalf. To the contrary, it was intended to "increase the availability of funds to health centers to provide primary health care services [] [b]y reducing or eliminating health centers' malpractice insurance premiums," thus freeing up funds to improve patient service, reduce barriers to health care, and implement federally funded programs.[1] The Court, therefore, lacks subject matter jurisdiction over Plaintiffs' claims.

This does not mean Plaintiffs are without a remedy. It means only that the United States is not the proper defendant. Plaintiffs may still pursue their remaining claims in state court, where indeed they initially brought their claims against BSW Hospital and Dr. Brakovec.[2]

---

[1] *See* Health Res. & Servs. Admin. (HRSA), HHS, *Federal Tort Claims Act Health Center Policy Manual* 9 (July 21, 2014), https://perma.cc/DP5S-HH8N (FTCA Manual), https://bphc.hrsa.gov/sites/default/files/bphc/technical-assistance/ftcahc-policy-manual.pdf. At the same time, "[i]t is recognized that health centers may engage in non-covered activities" beyond their federal scope of project, for which they "may want to consider gap or wrap-around coverage to provide private insurance for activities not subject to FTCA coverage." FTCA Manual at 18.

[2] In that case, commenced in November 2023, Plaintiffs sued BSW Hospital and two physicians employed there, one of which was Dr. Brakovec. Dr. Brakovec was dismissed from

**BACKGROUND**

**A. Plaintiff's Prenatal and Delivery Care with BSW**

In 2021, Plaintiff Stefanie Warneke became an obstetrical patient of Dr. Belinda Kohl-Thomas at a Baylor Scott & White Women's Care in Temple, Texas. ECF No. 26 ¶ 34. On the evening of December 17, 2021 (a Friday), Plaintiff Warneke became concerned due to decreased fetal movement. *Id.* ¶ 37. She and her father went to BSW Hospital, "rather than to her own physician, because she'd been in Waco visiting her father and her own doctor's clinic is generally not open at 10:01 p.m. on Friday evenings." *Id.*; *see also* ECF No. 77-18 at ¶¶ 7–10; ECF No. 77-19 at ¶ 4 ("I encouraged Stefanie that she should immediately go to a local hospital and not try to travel approximately 35 miles back to Temple, Texas."). Prior to her arrival at BSW Hospital, Plaintiff Warneke had never been a patient of WFM and had never received care from any doctor employed by WFM, including Dr. Jenny Brakovec. ECF No. 26 ¶ 35.

Plaintiffs' claims arise from the labor and delivery care that Plaintiff Warneke received from Dr. Brakovec on the night of December 17, 2021. *Id.* ¶ 37. At the time, Dr. Brakovec was both employed as an obstetrician by BSW Hospital and contracted to WFM. *See* ECF No. 27-2 at 1 (WFM contract identifying Dr. Brakovec as a "fully-privileged . . . obstetrician/gynecologist . . . actively practicing obstetrics and gynecology and complying completely with the applicable medical staff bylaws at Hillcrest Baptist Medical Center in Waco, TX[.]").

**B. WFM's Federal Deeming**

WFM was (and is) a recipient of certain federal grant funding through the FSHCAA program. Under that program, grant recipients can apply to be treated as "deemed" entities of the

---

that action in January 2024, and Plaintiffs' remaining claims against the other defendants resulted in a settlement agreement approved by the state court in November 2024.

3

United States Public Health Service (PHS), such that medical negligence claims resulting from services provided by the health centers to "patients of the entity" are treated as actions brought against the United States under the Federal Tort Claims Act (FTCA). 42 U.S.C. § 233(g)(1)(A), (B)(i). And, "subject to [42 U.S.C. § 233(g)(1)(C)]," that coverage can also apply to the health centers' services "to individuals who are not patients of the entity." 42 U.S.C. § 233(g)(1)(B)(ii).

Health center coverage under this program "is limited to the performance of medical, surgical, dental, or related functions within the scope of the approved Federal section 330 grant project." FTCA Manual at 4. That "scope of project" is defined by "[f]ive core elements":

- Where will services be provided (service sites)?
- What services will be provided (services)?
- Who will provide the services (providers)?
- What geographic area will the project serve (service area)?
- Who will the project serve (target population)?

HRSA, "Policy Information Notice" (PIN) No. 2008-01 at 5, *available at*:

https://bphc.hrsa.gov/compliance/policy-information-notices-pins-program-assistance-letters-pals#2008 (PIN 2008-01, last accessed Aug. 24, 2025); *see also* FTCA Manual at 7 (citing PIN 2008-01).

In a health center grant application, service sites—the locations at which the health center provides primary health care services to individuals who become "patients of the entity" under 42 U.S.C. § 233(g)(1)(B)—are identified in Form 5-B. PIN 2008-01 at 4–5. WFM's Form 5-B for the relevant time period, *see* ECF No. 27-3 at 122–27, lists fourteen service sites. BSW Hospital is not among them.[3] BSW Hospital could not be a WFM service site, which must be a

---

[3] One listed service site is the WFM Women's Health Center, located *near* BSW Hospital but in a separate building. *See* ECF No. 27-3 at 125. But that site is not part of BSW Hospital and is not where Plaintiff Warneke presented at the night of her delivery. Form 5-B identifies it as a site that is "operated by" WFM, not by BSW, and that is open 40 hours per week, not after business hours. The WFM website confirms that this site's hours of operations

4

location where (among other requirements), the health center's "governing board retains control and authority over the provision of the services[.]" PIN 2008-01 at 5. And "[o]nly those service sites listed on Form 5-Part B: Service Sites from the most recent approved application . . . are a part of a grantee's approved scope of project." PIN 2008-01 at 5.

In addition to the service sites identified on Form 5-B, a health center grant application also identifies, on Form 5-C, other activities it engages in at other locations. These may include non-service site locations where health centers provide continuity-of-care services to individuals already established as health center patients, such as admitting them to local hospitals. *See* ECF No. 27-3 at 128.[4] Often, however, to obtain the access needed to provide services to health center patients at sites not controlled by the health center, health center doctors are required to provide services to non-patients of the health center. Recognizing this, Congress has defined certain circumstances in which "services provided . . . to individuals who are not patients of the entity" can still be covered—"if the [HHS] Secretary determines" that the arrangement meets certain requirements. *See* 42 U.S.C. § 233(g)(1)(C)(i)–(iii) (listing the requirements). And HHS has gone a step further, describing in regulation four common arrangements for which services to

_____

(both now and at the relevant time) were from 8 am to 5 pm, Monday through Friday. *See* Waco Family Medicine – Women's Health, (captured November 27, 2021), https://web.archive.org/web/20211127195940/https://wacofamilymedicine.org/womens-health/. *Cf.* ECF No. 26 at ¶ 37 (Plaintiff Warneke went to BSW Hospital because "her own doctor's clinic is generally not open at 10:01 p.m. on Friday evenings."); *see also* ECF No. 77-18 at ¶¶ 7–10.

[4] WFM's Form 5-C lists "Hospital Admitting" and "Admitting patients into hospital and nursing home locations" at "Hillcrest Health System" and other local hospitals and nursing homes; "Medical rounds" for "[c]are of patients in non-clinic locations" at Hillcrest Health System and other locations; and "Health Education" including "Physician and caregiver training" at "[a]ll Service Sites, Schools, Senior Centers, Community Centers, Malis, Churches, Eighteen County Regional Area Health Education Center, Physician Offices, Hospitals, Nursing Homes, Long Term Acute Care Centers, Businesses, Faculty Development Center of Texas, etc." ECF No. 27-3 at 128–29.

non-patients can be covered without need for separate identification or application—but only if the health center activities "fit[] squarely within these descriptions; otherwise, the health center should seek a particularized determination of coverage" from HHS. 42 C.F.R. § 6.6(e)(4).

## C. The Aligned Parties'[5] Arguments for Coverage

Plaintiffs now contend that, because Dr. Brakovec and Dr. Ryan Trantham (another physician who treated Plaintiff Warneke at BSW Hospital) were, respectively, a contractor and an employee of WFM, and because WFM had received FSHCAA grant funding and was a "deemed entity," Plaintiffs are entitled to recover from the United States for Dr. Brakovec's alleged negligence. Unsurprisingly, Dr. Brakovec and Waco Family Medicine agree, and further argue that Plaintiffs are precluded from recovering from them for Dr. Brakovec's alleged negligence and must instead recover from the United States. ECF No. 78 at 7; 79 at 7.

These arguments are mistaken. The "deemed" status of a health center like WFM does not mean that it is covered as to all claims or that it may transfer all liability to the United States. Rather, relevant here, that deeming status extends only to WFM's services to "patients of the entity"—that is, to patients *of the health center* (WFM), not patients of the health center's employees, or its contractors, or patients of other entities at non-health-center service sites where WFM staff may interact with another entity's patients, like BSW Hospital. 42 U.S.C. § 233(g)(1)(B)(i).

---

[5] Since Plaintiffs, Defendant Dr. Brakovec, and Defendant WFM have aligned in their arguments that the United States is the proper party to hold liable for Dr. Brakovec's alleged negligence, this brief refers to them collectively as the "aligned parties."

As Plaintiff Warneke was not a patient of WFM at the time of Dr. Brakovec's alleged negligence—and the non-patient care provisions of 42 U.S.C. § 233(g)(1)(C) [6] and 42 C.F.R. § 6.6(e)(4) do not apply—Plaintiff's claim does not fall within the FSHCAA's protections and fails to properly invoke jurisdiction under the FTCA. ECF No. 27.

The aligned parties offer two over-arching arguments in their responses. *First*, they argue that Plaintiff Warneke became a patient of WFM when she arrived at BSW Hospital because the hospital's records show a "triage" shortly after her arrival. This argument is premised on an out-of-context misreading of a single bullet point in the HHS FTCA Policy Manual and runs contrary to the caselaw interpreting 42 U.S.C. § 233's patient/nonpatient distinction. *Second*, they argue that, even if Plaintiff Warneke was not a "patient of the entity[,]" WFM's treatment of her nonetheless qualifies for coverage under 42 C.F.R. § 6.6(e)(4)(ii) ("Hospital-Related Activities") and the FTCA Manual's examples of "additional activities" that may be conducted off-site. But the activities in this case do not fit "squarely" within the hospital-related activities exception for care to non-patients, as required by § 6.6. 42 C.F.R. § 6.6(e)(4). If in doubt, the regulation provides that health centers should "seek a particularized determination of coverage" from HHS (which, it is undisputed, WFM did not do as to its activities at BSW Hospital). WFM's activities at BSW do not "fit[] squarely" within the regulatory description of Hospital-Related Activities (or any other exception), so the non-patient coverage provisions of Section 6.6 do not apply.

---

[6] Those conditions, listed at 42 U.S.C. § 233(g)(1)(C)(i)–(iii), account for scenarios where care provided to non-patients benefits patients of the entity or facilitates the provision of services to them—covering, for instance, care that a physician might be obligated to provide to non-patients as a condition of obtaining admitting privileges at a hospital, allowing the health center's physicians, in turn, to continue the care of the health center's patients in the hospital setting.

Nor can the activities be covered as "additional activities" listed in the FTCA Manual. The examples Plaintiffs rely on, "supervision of students and medical residents" and "obstetrical supervision" explicitly contemplate the supervision of non-health center staff. FTCA Manual § C.5.2 Supervision. This case, however, does not involve supervision of non-health center staff. Plaintiffs contend that Dr. Brakovec's own conduct was negligent, and to the extent there are any allegations regarding negligent supervision, it was the supervision of WFM staff. These examples are therefore inapplicable and cannot provide FTCA coverage.

## ARGUMENT

### A. Plaintiff Warneke Did Not Become a "Patient[] of the Entity" on December 17, 2021

A key limitation to taxpayer-funded coverage under FSHCAA is that the health center provider must have treated a health center patient or, if a non-patient, been within a recognized exception or received a particularized determination. The aligned parties attempt to shoehorn Plaintiff Warneke, who admitted she was a BSW patient in Temple, into an invented definition of a health center patient, which defies the statute and regulations (as well as common sense).

#### 1. "Scope of Employment" is just one part of the analysis.

The aligned parties argue that, because Dr. Brakovec was acting within the scope of her contract with WFM at the time of the events giving rise to Plaintiffs' claims, the FSHCAA "scope of employment" requirement from 42 U.S.C. § 233(a) is satisfied. *See* ECF No. 77 at 8-11. But that approach skips a key subsection: 42 U.S.C. § 233(g), which describes the scope of an employee's *deemed* employment. Put another way, before "scope of employment" is relevant, it must first be ascertained whether the entity or individual was "deemed" to be a PHS employee for the particular services giving rise to suit. By statute, "deeming" does not apply to services to non-patients; thus, neither WFM nor Dr. Brakovec could be "deemed" to be PHS employees for

such services absent a recognized exception. *See* 42 U.S.C. § 233(g)(1)(B), (C). Before evaluating whether the provider acted within the scope of her health center employment, it is necessary to consider whether the health center's activities were within the scope of its federal project—whether the entity was even "deemed" to be a PHS employee, or put otherwise, whether that entity or individual acted within the scope of their *deemed* employment to begin with.

WFM's response similarly ignores this statutory limitation on services to which "deemed" status applies. WFM claims that it and its personnel were acting within the scope of their employment because the services provided were "comfortably within WFM's grant project." ECF No. 79 at 10. But they also ignore that these services must be provided to a patient of the entity (or fall within an exception) to be within their scope of *deemed* employment, and therefore eligible for FTCA coverage. That the services in this case were within the scope of services contemplated by WFM's contract with Dr. Brakovec and related to grant-supported activity are *necessary* conditions for FTCA coverage, but they are not *sufficient* in and of themselves if they were provided to a non-patient outside of a recognized exception.

Accordingly, the Court's analysis should begin and end with analyzing patient status, despite the aligned parties' attempts to read that requirement out of the statute and distract from the ultimate issue by briefing irrelevant and/or uncontested matters.

## 2. BSW Hospital was not an approved service site.

Plaintiffs argue that, by presenting at BSW Hospital and accepting treatment from physicians identified by name tag as affiliated with WFM, Plaintiff Warneke was "formally admitted . . . as a patient of WFM"—and that "[i]t is undisputed that Warneke was . . . 'admitted' as a patient to WFM . . . immediately upon entering [BSW] Hospital." ECF No. 77 at 21. These

assertions are flatly wrong and very much in dispute. To become a "patient of the entity" under the FSHCAA requires more.

In support of this contention, the aligned parties attach declarations from various WFM doctors and administrative personnel, who attest as to WFM's opinion that Plaintiff Warneke became a WFM patient upon first receiving services at BSW Hospital from a WFM-affiliated physician (*i.e.*, Dr. Trantham and, later, Dr. Brakovec). *See, e.g.*, ECF No. 77-21 at ¶ 12 (Decl. of WFM Women's Health Center Director Dr. Katy Wesley that Plaintiff Warneke "became a patient of WFM the moment Dr. Trantham, a WFM resident, was called upon to perform her triage service"). These declaration statements may speak to when WFM considered Plaintiff Warneke to be their patient, or when Plaintiff Warneke became a patient of a WFM-affiliated physician,[7] but it does not speak to the question of patient status under 42 U.S.C. § 233 and affiliated FSHCAA program requirements.

First, BSW Hospital was not an approved service site at which WFM could, for FSHCAA purposes, establish new patient relationships. Moreover, WFM knew this because, as a federal grant recipient, WFM agreed to the funding conditions and FSHCAA program rules establishing this limitation. WFM's Form 5-B lists fourteen service sites—none of which are BSW Hospital. *See supra* note 3; *Thomas v. Phoebe Putney Health Sys., Inc.*, No. 1:18-CV-096 (LAG), 2019 WL 6039976, at *4 (M.D. Ga. Mar. 6, 2019) (coverage did not apply where "[t]he Grant [the health center] received was to provide primary care services to fifteen delivery sites. [A hospital]

---

[7] Significantly, establishing as the patient of a health center-affiliated doctor is not the same thing as establishing as a "patient[] of the entity" under 42 U.S.C. § 233. *Kelley v. Richford Health Ctr., Inc.*, 115 F.4th 132, 140 (2d Cir. 2024).

was not one of those designated sites, and [plaintiff] was not transferred to [the hospital] from [a health center] delivery site.").[8]

Attempting to elide this limitation, WFM notes that other sections of its grant application refer to its activities at other sites. *See* ECF No. 79 at 11 (summarizing declaration of Matthew Polk). This should come as no surprise, since Form 5-C of the WFM application identifies local hospitals (including BSW Hospital) as sites where WFM admits and treats individuals already established as its patients (typically, patients who had received prenatal care from WFM, unlike Plaintiff Warneke), or where it might receive coverage for providing coverage-qualifying non-patient care.[9] None of this transforms BSW Hospital into a service site at which WFM might establish new patient relationships.

---

[8] Notably, the claims in *Thomas* arose from allegations that a health center-employed doctor, working in a hospital setting, "failed to appreciate the critical nature of [plaintiff's] condition, causing [him] to receive delayed and inadequate treatment"—activities that might commonly be described as "triage." *Compare, e.g.*, ECF No. 77-22 at ¶ 14 (Dr. Trantham's definition of "obstetric triage"). WFM attempts to distinguish *Thomas* on the basis that the hospital-based activities of the health center in that case were "completely separate" from the health center's grant-supported activities. ECF No. 79 at 16–17. But there, as here, the doctor was affiliated both with the hospital and the health center, the hospital was located in the health center's service area but was not listed in its grant application as a health center service delivery site (nor could it have been), and the hospital and health center entered into a separate agreement under which the health center provided coverage (here, obstetrical and gynecological, there pediatric hospitalist) "twenty four hours a day, seven days per week." *Thomas*, 2019 WL 6039976, at *1. In all of these respects, WFM's activities at BSW Hospital are at least as distinct from its grant-supported activities as the activities in *Thomas*.

[9] The parties do not dispute that WFM did not receive that prior approval, in the form of a "particularized determination," for its activities at BSW Hospital. *See* ECF No. 79 at 17–20 (WFM argument that particularized determination was unnecessary). For the reasons explained below, the services provided by WFM to Plaintiff Warneke do not "fit[] squarely" within these examples, and thus do not qualify for coverage in the absence of a particularized determination. 42 C.F.R. § 6.6(e)(4).

### 3. **Plaintiff Warneke's BSW Hospital "triage" did not transform her into a patient of WFM.**

To overcome the problem with their overbroad argument that an individual can become a health center patient anywhere a health center provider provides care, the aligned parties focus on a single bullet point in Section C.3 of the FTCA Manual, which describes the establishment of a new patient relationship by contacting a "[h]ealth center triage service" in person or by phone. FTCA Manual at 8.[10] The aligned parties argue that, because that bullet point does not restate the overarching site-based limitation on the health center scope of project, it creates a loophole that allows services at *any* site to establish new patient relationships under 42 U.S.C. § 233(g)(1)(B) as long as they are labeled as "triage." *See, e.g.*, ECF Nos. 77 at 19, 79 at 12–13; *but cf.* FTCA Manual at 8 (coverage is "limited to . . . sites, services, and other activities or locations, as defined in the covered entity's grant application and any subsequently approved change in scope requests."). This loophole would swallow the site-based limitation that is the first of the five core elements defining scope of project. *See* PIN 2008-01 at 5.[11] This blinkered reading is improper where "context requires a different result." *Gonzales v. Carhart*, 550 U.S. 124, 152

---

[10] The aligned parties now acknowledge that the term "patient[] of the entity" is defined in the administrative guidance issued by HHS, including the FTCA Manual published by the HHS Health Resources and Services Administration (HRSA) (the FTCA Manual). Plaintiffs previously contended that the controlling definition of "patient" was that set forth in Dr. Brakovec's contract with WFM. *See* ECF No. 26 at ¶ 31. They now appear to have abandoned that argument. *See* ECF No. 77 at 19 (arguing that "'patient of the entity' is defined within the FTCA Manual published by the HRSA," a definition Plaintiffs now argue is controlling and entitled to *Skidmore* deference, *see id.* at 13–14).

[11] Indeed, WFM's contract with Dr. Brakovec purports to provide that all unassigned patients who presented at BSW Hospital would become WFM patients, and that any care provided to those patients by Dr. Brakovec would be "covered . . . under the FTCA[.]" Docket no. 77-4 at 3–4. This arrangement—never presented to or approved by HHS—bears no resemblance to WFM's approved scope of project and effectively transfers all claims of obstetrical malpractice by unassigned patients at BSW Hospital to the United States. *But cf. Kelley*, 115 F.4th at 140.

(2007); *see also, e.g.*, *Texas Truck Parts & Tire, Inc. v. United States*, 118 F.4th 687, 692 (5th Cir. 2024) (noting that the "[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)); rejecting a "'narrow, crabbed reading of a text.'"). This argument also cannot be reconciled with governing caselaw and would amount to a dramatic expansion of health center coverage irreconcilable with the plain language of 42 U.S.C. § 233 and its reticulated distinctions between patients of an entity and individuals who are not patients of the entity.

The aligned parties' argument ignores that, even read in isolation, Section C.3 contemplates the creation of a patient relationship through provision of "[h]ealth center" triage services—not any service labeled as "triage" by a health center physician. This is consistent with the caselaw recognizing that establishing as a patient of a health center-employed physician is not the same as establishing as a "patient[] of the entity" for FSHCAA purposes. *See Kelley v. Richford Health Ctr., Inc.*, 115 F.4th 132, 140 (2d Cir. 2024).[12] Just so, a triage service performed in a non-health center setting does not become a "[h]ealth center triage service" merely because it is performed by a health center-affiliated physician. *Compare, e.g.*, *Cromer v. Dignity Health*, No. 2:24-CV-04731-WLH-SK, 2025 WL 1153808, at *9 (C.D. Cal. Apr. 18,

---

[12] The aligned parties attempt to distinguish away *Kelley* based on various immaterial factual differences. *See, e.g.*, ECF Nos. 77 at 16–17; 79 at 17 (noting that *Kelley* did not involve hospital-related call coverage or medical residency activities). Immaterial distinctions notwithstanding, *Kelley* is squarely on point and is fatal to Plaintiffs' leading argument. Plaintiffs contend that Plaintiff Warneke was "formally *admitted as a patient of WFM*" upon being triaged and receiving treatment from Dr. Trantham and Dr. Brakovec. But establishing a patient relationship via triage must occur through a "[h]ealth center triage service[]"—not by any act of triage performed anywhere by a health center-employed physician. *Kelley* makes this clear, noting that "the FSHCAA's plain text . . . limits HHS's deeming decision to 'patients of the *entity*,' not patients of the entity's employees." *Kelley*, 115 F.4th at 140.

2025) ("patient or nonpatient status is determined not by the treating physician, but by where the care was received.").  It is also consistent with HRSA's own interpretation. HRSA testified, repeatedly, that the health center triage services must be the health center's own triage services, *i.e.*, the services must occur at a health center service site within the scope of approved project that is owned, operated, and controlled by the health center or, if by phone, by specifically calling the health center. *See* Ex. A at 26:22-27:9; 53:12-20; 61:22-62:11; 67:22-68:18; 131:18-132:16.

Furthermore, Section C.3's plain language requires that triage services must, in fact, be "health center triage services" *and* there must be intent to become a registered patient. This is plainly illustrated by the Section C.3 example provided in the FTCA Manual, which involves "[a] patient not previously known to the health center" who "calls complaining of nausea and is given an appointment for the next day." FTCA Manual at 9. A patient relationship is established by this encounter, the example explains, because the patient who directed her call to the health center was triaged *and* made an appointment for medical care at the health center. FTCA Manual at 9. Here, there is no dispute that Plaintiff Warneke did not call or appear at a WFM service site. Rather, she presented at BSW Hospital.[13] A "triage" was documented shortly after her arrival, but not a "'health center triage service.'" FTCA Manual at 8. It occurred at BSW Hospital, not at

---

[13]  In declarations attached to Plaintiffs' opposition, Plaintiff Warneke and her father now claim that they went to BSW Hospital "intend[ing] to be seen and treated by the Waco Family Medicine doctors and residents[.]" ECF No. 77-18 at ¶ 11. This improbable claim—that Plaintiff intended, by presenting at a hospital, to establish a patient relationship not with the hospital, but with an un-affiliated clinic that contracted with some of the doctors who also worked at the hospital (a clinic from which she had never previously sought or received any service whatsoever)—is in stark contrast to the facts pled in her First Amended Complaint, before Plaintiffs were availed of the arguments in the United States's Motion to Dismiss. *Cf. e.g.*, ECF No. 27 at ¶¶ 35–37 ("Ms. Warneke presented at *Baylor Scott & White Hillcrest Medical Center* in Waco, Texas"; no mention of "intent" to establish care with WFM) (emphasis added).

a "site . . . defined in [WFM's] grant application [or] any subsequently approved change in scope requests[.]" FTCA Manual at 8. For all of these reasons, the aligned parties' attempt to use an isolated line about a health center's triage services in the FTCA Manual fails to establish Plaintiff Warneke as a health center patient when she was treated by Dr. Brakovec at BSW Hospital.

## B. WFM's Activities at BSW Hospital Did Not Satisfy the Non-Patient Care Provisions of 42 U.S.C. § 233(g)(1)(B) or 42 C.F.R. § 6.6

Services provided to non-health-center-patients may be covered in limited circumstances, and Plaintiffs incorrectly argue that the services provided to the non-patient (Plaintiff Warneke) in this case fall under the "Hospital-Related Activities" example in § 6.6(e)(4). A careful reading of this exception shows it does not contemplate the services provided in this case.

For this exception to apply, three conditions must be met: (1) hospital call or emergency room coverage must be periodic; (2) periodic call or coverage must be required by the hospital as a condition for obtaining hospital admitting privileges; and (3) there must be documentation that periodic call or coverage is a condition of employment at the covered entity. *See* 42 C.F.R. § 6.6(e)(4)(ii). None of the conditions are met in this case.

This exception contemplates the periodic presence of a health center provider at a hospital for the purpose of obtaining and maintaining admitting privileges to admit the health center's own patients. That makes sense, because admitting *a health center's own patients* is required for continuity of care, and a hospital will not qualify as an approved service site listed in Form 5-B. The FTCA Manual explains, "[a] covered individual may *follow a covered entity's patient* to a local non-health center site in order to maintain continuity of care, if the service provided at the non-health center site is within the covered entity's scope of project and the

covered individual's scope of employment for the purpose of FTCA coverage."[14] FTCA Manual at 10 (emphasis added). PIN 2008-1 specifically describes "[f]ollowing the health center's patients to the hospital (admitting privileges)" as an example of an "other activity" that may be covered despite not being performed at an approved service site. PIN 2008-1 at 7-8 (emphasis added). Accordingly, this exception contemplates a situation where a health center employee periodically provides services at a hospital for the express purpose of obtaining and maintaining admitting privileges to admit the health center's own patients. Here, Dr. Brakovec's contract did not require her to obtain or maintain admitting privileges at BSW Hillcrest in order to satisfy her obligations to WFM or their patients.

WFM's presence at BSW Hillcrest, furthermore, is anything but periodic. They maintain a constant, 24/7 presence at the hospital.[15] WFM contracted with Dr. Brakovec (a daytime BSW employee), along with other contractors, to maintain its 24/7 presence in the hospital and ensure its residents were supervised at all times. The contractual arrangement between WFM and Dr. Brakovec was predicated on the fact that Dr. Brakovec *already had* the required admitting

---

[14] WFM invokes a prior case arising out of its activities at BSW Hospital in which the United States determined coverage in WFM's favor. ECF No. 79 at 19–20 (summarizing the *J.W.* case). But they neglect to mention what distinguished that case from this one: As HHS Agency Counsel Sean Flaim testified, that case involved a plaintiff who had established as a patient of WFM by receiving services at a WFM service delivery site prior to the date of her arrival at BSW Hospital. *See* ECF No. 77-17 (noting that "the patient in that case had gone to the Health Center years earlier, and so had an established doctor patient . . . relationship with the health center.").

[15] It is for this reason that the Sixth Circuit's opinion in *Bray v. Bon Secours Mercy Health, Inc.*, 97 F.4th 403, 414 (6th Cir. 2024), does not support the aligned parties' position. WFM relies on that opinion at length. *See* ECF No. 79 at 14–16. But in contrast to the 24/7 coverage arrangement between WFM and BSW Hospital, that case involved an arrangement in which "[health center] obstetricians would provide call coverage overnight and on weekends in exchange for [the hospital] paying [the health center] a flat rate for the physician's time." *Bray*, 97 F.4th at 408.

privileges from her BSW employment. *See* ECF No. 27-2 ("Whereas, Physician is fully privileged as an obstetrician/gynecologist and is actively practicing obstetrics and gynecology and complying completely with the applicable medical staff bylaws at [BSW Hospital] . . ."). At most, Dr. Brakovec's contract contemplated that she would maintain the admitting privileges she already had and comply with the bylaws she was already obligated to comply with by virtue of her employment with BSW. That is not sufficient to meet the hospital-related activities exception. *See Cromer*, 2025 WL 1153808, at *12 (analyzing a similar 24/7 presence of a health center in a hospital and explaining that "[b]ecause the arrangement was not for the Eisner Defendants to provide *periodic* calls and coverage as a *condition* of obtaining admitting privileges, the argument fails").

Moreover, the purpose of this arrangement was not to admit pre-existing health center patients to BSW Hillcrest for continuity of care. It was, instead, to ensure constant supervision of residents treating anyone who walked through the door of BSW Hillcrest regardless of any prior affiliation with WFM. The circumstances of this case do not remotely approach the hospital-related activities example in § 6.6(e), let alone fit "squarely" within it.

## C. The services provided do not fall within the "Additional Activities" contemplated by the FTCA Manual.

Plaintiffs also contend that, even if Plaintiff Warneke were not a patient of WFM, the services provided to her are still covered under as "additional activities" under the FTCA Manual. ECF No. 77 at 19-20. The FTCA Manual provides examples of "additional activities" that may be properly conducted on behalf of a covered entity despite occurring "off-site," *i.e.*, at a location other than the approved sites listed in Form 5-B. *See* FTCA Manual at 10-12. One additional activity is "Supervision." FTCA Manual § C.5.2. The manual lists two examples of supervision: supervision of students and medical residents and obstetrical supervision. Plaintiffs

claim that the services in this case fall under both examples. ECF No. 77 at 19-20. They plainly do not.

Plaintiffs' argument, again, suffers from selective omission and out-of-context reading. It also involves more misdirection: Plaintiffs complain about the care provided by Dr. Brakovec herself—not anyone she was supervising. Before providing the specific examples of what may constitute the additional activity of supervision, the "Supervision" paragraph provides:

> **Supervision of non-health center staff** by a covered individual is a covered activity if the service performed by the supervisee is (1) for the covered entity's patients (and, in certain circumstances, those addressed in section C.4, for non-health center patients), (2) is within the scope of employment of the covered individual. However, **the non-health center staff being supervised** by the covered individual are not covered by FTCA.

FTCA Manual § C.5.2 (emphasis added). This contemplates situations where a covered individual is supervising non-health center staff—presumably hospital staff. Here, Dr. Brakovec was contracted specifically to supervise health center staff—WFM's residents. Plaintiffs go to great lengths to emphasize that the services provided to Warneke were exclusively provided by WFM staff. *See* ECF No. 77 at 8-11. Because the services provided in this case did not involve the supervision of non-health center staff, they cannot be covered under the FTCA as an "additional activity."

Even if the additional activity of "supervision" encompassed supervision of health center staff, and even further assuming Plaintiffs' claims arose from Dr. Brakovec's supervision at all, the examples provided do not match the circumstances of this case. Similar to the "hospital-related activities" exception in § 6.6(e), the proper supervision of students and medical residents under this example requires, in the absence of a particularized determination, that "hospital call or emergency room coverage is required by the hospital as a condition of obtaining hospital admitting privileges and is in the covered entity's employment contract documentation." *See*

FTCA Manual § C.5.2 Examples—Supervision of Students and Medical Residents. Again, Dr. Brakovec's contract with WFM does not require hospital call or emergency room coverage as a condition of obtaining hospital admitting privileges. *See supra* at 15–17. The "obstetrical supervision" example is explicitly premised on the supervision of "hospital staff" during delivery of "a covered entity's patient." *See* FTCA Manual § C.5.2 Examples—Obstetrical Supervision. This case involves neither the supervision of hospital staff nor the delivery of a covered entity's patient. As such, the services provided in this case cannot constitute covered "additional activity" under the FTCA Manual.

### D. WFM Fails to Show That it is Entitled to Coverage or Immunity

Finally, the United States addresses the arguments advanced by WFM itself.[16] To begin with, WFM claims that 42 U.S.C. § 233(a) conveys upon it a "comprehensive grant of absolute immunity[,]" ECF No. 79 at 5, and even goes so far as to argue that this supposed "absolute" and "comprehensive" immunity is not limited by Congress's patient–nonpatient distinction in 42 U.S.C. § 233(g), ECF No. 79 at 11–12,[17] and that HHS's FSHCAA regulations, 42 C.F.R. § 6.6, "cannot[] impose a binding legal obligation on WFM." *Id.* at 17.

---

[16]  WFM has filed its own separate response opposing the United States's Motion to Dismiss—but WFM has asserted no claims that invoke jurisdiction under the FTCA. And WFM has not itself sought to be dismissed from this lawsuit—on the contrary, they have worked collaboratively with Plaintiffs to assist the Plaintiffs in establishing jurisdiction in this Court so that they do not become a defendant in state court should this Court grant the United States' motion to dismiss.

[17]  WFM cites the Ninth Circuit's opinion in *Friedenberg v. Lane County*, 68 F.4th 1113 (9th Cir. 2023) for the proposition that Section 233(g) was not intended to limit the scope of protection provided to deemed PHS employees like Dr. Brakovec. ECF No. 79 at 12. But *Friedenberg* dealt with a scenario not present here, in which non-patient plaintiffs brought claims related to a health center's treatment of a patient who injured them—allegations that the health center failed to report nonadherence to a mental health treatment plan by a patient who subsequent killed and injured several people during a psychotic episode. There, the Ninth Circuit found that Section 233(g)'s patient/non-patient distinctions did not limit who could *bring* claims

Yet elsewhere, WFM acknowledges that its protection under 42 U.S.C. § 233(a) is actually neither "comprehensive" nor "absolute." It encompasses only claims "resulting from the performance of medical . . . or related functions" and only where that performance is "within the scope of the deemed federal employment." ECF No. 79 at 5. Most relevant, WFM acknowledges that this coverage only applies to activities within WFM's "approved scope of project[.]" ECF No. 79 at 8–9; HRSA PIN No. 2008–01; *see also* FTCA Manual at 7 (also citing PIN 2008–01). As explained above, Plaintiff Warneke did not become a patient of WFM on December 17, 2021. Dr. Brakovec treated her at BSW Hospital, not a WFM service site, so that activity was not within WFM's "approved scope of project[.]" It also did not "fit[] squarely" within the non-patient care provisions of 42 C.F.R. § 6.6(e)(4).

Having claimed an absolute immunity not limited by Congress in Section 233(g), WFM goes on to claim that HHS's regulations regarding the FSHCAA program "cannot[] impose a binding legal obligation on WFM" because they are "interpretive in nature" rather than legislative. ECF No. 79 at 17. WFM's basis for this bracing claim is that, in a 1997 Public Information Notice (PIN), HHS characterized the 1995 regulations as "interpretive in nature." ECF No. 79 at 17 (quoting HRSA, Policy Information Notice No. 1997-06, ECF No. 79-14 at 11). This claim of impunity from regulatory oversight is flawed in myriad ways.

---

against deemed PHS employees. *Friedenberg*, 68 F.4th at 1118 ("Section 233 immunity does not turn on *who* brings the claim"). As to the wholly separate question of whether claims must result from services provided to patients, the statutory text is plain: Subject to limited exceptions, "[t]he deeming . . . shall apply with respect to services provided . . . to all patients of the entity[.]" 42 U.S.C. § 233(g)(1)(B). This limits coverage by conditioning coverage for non-patient services on the exceptions in 42 U.S.C. § 233(g)(1)(C). *See* 42 U.S.C. § 233(g)(1)(B)(ii) ("deeming . . . shall apply . . . *subject to subparagraph (C)*, to individuals who are not patients of the entity.") (emphasis added). Nothing in *Friedenberg* suggests otherwise.

First, this argument simply ignores that the 1995 regulation was superseded by a 2013 regulation that enacted the current particularized determination provisions of 42 C.F.R. § 6.6(e)(4). *See* Federal Tort Claims Act (FTCA) Medical Malpractice Program Regulations: Clarification of FTCA Coverage for Services Provided to Non-Health Center Patients, 78 FR 58202-01 ("The amended regulation will supersede the September 1995 Notice."). HHS's 1997 characterization of a 1995 regulation as "interpretative" says nothing about the interpretative or legislative character of a superseding regulation enacted (through notice and comment rulemaking and published in the Code of Federal Regulations[18]) more than two decades later. [19]

---

[18] WFM itself observes that "whether [a regulation] was published in the Federal Register or the Code of Federal Regulations" is a significant indicator of its character as interpretive or legislative. ECF No. 79 at 18 (citing *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006)). It is notable that WFM never addresses the interpretive or legislative character of the 2013 regulation—that is, the regulation actually at issue in this case.

[19] In a similar vein, WFM argues that "HHS promulgated 42 C.F.R. § 6.6 to implement the demonstration FSHCAA of 1992 only, not the final, permanent FSHCAA enacted in 1995"—a claim that cannot be squared with the 2013 superseding regulation that—decades after the "demonstration period" ended—re-enacted much of the current language of 42 C.F.R. § 6.6. More important still, WFM ignores that the final rule that HHS promulgated to be codified at 42 C.F.R. § 6.6 was issued on May 8, 1995. 60 Fed. Reg. 22,530 (May 8, 1995). Congress enacted the FSHCAA of 1995, Pub. L. 104-73, 109 Stat. 777, on December 26, 1995. That Act codified, the very standards HHS had promulgated for determining coverage for individuals who were not health center patients. *Compare* Pub. L. 104-73, § 4 (codified at 42 U.S.C. 233(g)(1)(B)-(C) *with* 42 C.F.R. § 6.6(d). Grant-supported activity was, therefore, generally limited to *patients* of an entity, but could be expanded to non-patients of the entity in limited circumstances as determined by the Secretary. *Id.* What's more, the House Report accompanying the 1995 FSHCAA, (H.R. 1747, later enacted as Pub. L. 104-73), expressly said that Pub. L. 104-73, § 4 "codifie[d] provisions of the May 8, 1995, final regulations" defining the conditions under which services to individuals who are not registered patients of a health center would be eligible for coverage. *See* H.R. Rep. 104-398, p. 7, 104th Cong., 1st Sess. (Dec. 12, 1995). That same report also fully endorsed HHS's later-enacted examples of situations where coverage for non-registered patients would be appropriate, including those codified at 42 C.F.R. § 6.6(e). *Id.* (acknowledging examples in HHS's September 25, 1995, public notice, 60 Fed. Reg. 49,417 and stating that "[t]he Committee intends that those situations continue to be recognized as being within the scope of coverage."). Congress, therefore, codified and ratified HHS's final rules on

Building on this flawed foundation, WFM next argues that it was not *required* to seek a particularized determination. ECF No. 79 at 18. This is plainly true—the regulation's text provides that health centers "should" seek a particularized determination if engaged in activities that may not "fit[] squarely" within the descriptions of pre-approved activities found at 42 C.F.R. § 6.6(e)(4). But it is also misdirection. Health centers are not *required* to seek particularized determinations—but they are also not assured of coverage if they opt not to do so and the activities in question are later found not to "fit squarely" into the 42 C.F.R. § 6.6(e)(4) descriptions. As explained above, WFM's activities at BSW Hospital did not. Having chosen not to assure itself of coverage through the particularized determination process, WFM cannot now claim an entitlement to be covered anyway.

## CONCLUSION

Plaintiffs' claims against the United States should be dismissed pursuant to Rule 12(b)(1).

---

coverage for individuals who are not patients of the entity, rendering it academic whether HHS once viewed its rules as "interpretive" or "legislative."

Dated: August 25, 2025             Respectfully submitted,

**Justin R. Simmons**
United States Attorney

By:     */s/ Landon A. Wade*
**Landon A. Wade**
State Bar No. 24098560
landon.wade@usdoj.gov
Robert D. Green
State Bar No. 24087626
robert.green3@usdoj.gov
Assistant United States Attorneys
U.S. Attorney's Office
903 San Jacinto Blvd., Suite 334
Austin, Texas 78701
(512) 370-1255 (phone)
(512) 916-5854 (fax)

***Attorneys for Defendant***
***United States of America***